UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| RANDI ALEXANDER, an Individual; and JACKSON YOUNG, an Individual,<br><br>Plaintiffs,<br><br>v.<br><br>KATHRYN FALK, an Individual; ROMANTIC TIMES INC. d/b/a ROMANTIC TIMES MAGAZINE, a New York Corporation; JANE DOE a/k/a "GRACIE WILSON," an Individual;[1] DOE DEFENDANTS 1 through 100; and ROE ENTITIES 1 through 100,<br><br>Defendants. | Case No. 2:16-cv-02268-MMD-GWF<br><br>ORDER |

## I.  SUMMARY

Plaintiffs Randi Alexander ("Alexander") and Jackson Young ("Young") (collectively, "Plaintiffs") bring this action largely sounding in defamation and disparagement under federal and Nevada laws. (ECF No. 1.) There are three pending motions before the Court. First, Defendants Kathryn Falk ("Falk") and Romantic Times, Inc. d/b/a Romantic Times Magazine ("RT") (collectively, "RT Defendants") have moved for (1) partial summary judgment on Plaintiffs' claims for punitive damages (ECF No. 103)[2] ("MPSJ") and (2) summary judgment on all claims Plaintiffs assert (ECF Nos. 1, 119) ("MSJ"). Plaintiffs have also filed an unopposed motion to amend (ECF No. 135) their response to RT Defendants'

///

---

[1] The Clerk granted Plaintiffs' request for entry of default against Wilson. (ECF No. 20.) Wilson has not filed any briefing relevant to the motions before the Court.

[2] The Court previously granted Plaintiffs' Motion to Proceed in Pseudonym. (ECF Nos. 49, 65)

first motion (ECF No. 108).[3] The Court will grant the unopposed motion to amend and will not discuss it further.[4] For the reasons below, the Court will grant RT Defendants' MSJ (ECF No. 119) and thus denies the MPSJ (ECF No. 103) as moot.[5]

## II. BACKGROUND

The material facts are undisputed, unless otherwise noted.

### A. The Parties

The following describes the parties only at the relevant time of the events underlying this action.

Alexander is an erotic romance novelist and Young is a romance novel cover model in the romance novel industry. (ECF No. 1.) The latter is also a country music entertainer who previously served in the military. (ECF No. 119-3 at 4–6.) RT's business is to promote romance and particularly promote/review romance books. (ECF No. 131-2 at 24–25.) Falk is the owner of RT and publisher of RT's magazine—which later dissolved—and is considered a pioneer of romantic fiction. (ECF No. 131-2 at 19–20, 24–25; ECF No. 119-5 at 4–5.) Falk held a yearly convention tailored to both readers and writers in the romance novel industry. (*e.g.*, ECF No. 131-2 at 131-2 at 4, 19, 31; ECF No. 119-5 at 28.) Falk's Romantic Times, Inc., dba RT Booklovers Convention ("RT Convention") originated over 35 years ago. (ECF No. 119-5 at 5, 30.)

### B. Relevant Facts

The controversies in this case stem from the RT Convention held in 2016. (ECF No. 131-12.)

The RT Convention took place at the Rio Hotel & Casino in Las Vegas on April 12–17, 2016. (ECF No. 1 at 5; ECF No. 131-12.) Falk described the RT Convention as having

///

---

[3]Plaintiffs' motion improperly identifies their response as ECF No. 106.

[4]Under LR 7–2, the "failure of an opposing party to file points and authorities in response to any motion shall constitute consent to the granting of the motion."

[5]In addition to the motions, the Court has considered the relevant responses (ECF Nos. 108, 131) and replies (ECF Nos. 111, 136).

"3,500 attendees, 200 seminars, countless parties, 700 authors signing books, and unforgettable evening extravaganzas in the spirit of Sin City." (ECF No. 131-2 at 31.) Falk looked forward to meeting people in her suite during the convention. (*Id.* at 40.)

Defendant Jane Doe a/k/a "Gracie Wilson" ("Wilson") and Young had a confrontation at a bar during the RT Convention. (ECF No. 131-5 at 16–18; ECF No. 131-6 at 5–6; ECF No. 131 at 3.) Wilson reported the incident and related matters to Falk and stated that she "didn't feel safe." (ECF No. 131-5 at 17, ECF No. 131-2 at 57–58, 60; ECF No. 119-11 at 4.)

During different conversations at the RT Convention concerning Young, Falk informed some attendees that she had received complaints about Young and Falk indicated that Young would not be invited back to the convention due to those complaints. (ECF No. 131-11 at 4–5; ECF No. 131-7 at 5; ECF No. 131-2 at 62.) One attendee, Anne Wills, testified that after Falk unexpectedly wanted to meet her, she was "scrambling" for something to suggest to Falk and recalled seeing Young perform in a musical gathering in Alexander's suite 48 hours before. (ECF No. 131-11 at 4.) Wills told Falk that she thought Young was "really talented" and suggested that "maybe next year" they could do something with Young and "[m]aybe Blushing Books"—Wills' company—"could sponsor that or something like that." (*Id.*) Wills testified that in response Falk said: "Well, I don't know that he is going to be coming back because we've had problems with him at two different conferences." (*Id.*) Wills further testified that Falk mentioned that she had heard that Young was sending inappropriate text messages to authors. (*Id.* at 5.) However, Wills also said that Falk "didn't say [Young] was doing it." (*Id.*)

Another attendee, Marla Williams, testified that she brought up Young's name to Falk during small talk, inquiring whether Falk knew Young. (ECF No. 131-7 at 5; ECF No. 119-6 at 7.) Williams said Falk responded that she had gotten "a lot of complaints about him[]" and subsequently mentioned that "there was a group of authors that said he was harassing them and they might file a lawsuit." (ECF No. 131-7 at 5.) Williams explained that Falk "didn't intentionally start bad-mouthing [Young] to me . . . the impression I got

3

was that she thought I was getting ready to register a complaint too." (ECF No. 119 at 6.) Williams testified that she suggested Falk talk to Alexander because Alexander was Young's business partner and Falk stated "Well, from what I've heard, she probably wouldn't care." (ECF No. 131-7 at 6.) When asked by Plaintiffs' counsel whether Falk believed Young and Alexander were more than business partners, Williams explained "[s]he didn't say she knew that for a fact. She just said she had been told that." (ECF No. 119-6 at 6; *see also id.* at 7.)

Nonetheless, Young testified that he was told the conversations between Falk and Wills and Williams included claims of extortion and blackmail. (ECF No. 131-3 at 15.) Excerpts from Alexander's notebook, dated with days during the RT Convention, reflect the alleged complaints about Young, including a particular message suggesting it had been stated that Young was "blackmailing me into business partnership." (*See generally* ECF No. 131-17; *id.* at 3.)

Another attendee, Staci DeWitt, testified that her mother told her that while she had been in Falk's penthouse at the RT Convention she heard Falk say that there were authors who were unhappy with Young and that Young had been sending inappropriate text messages. (ECF No. 131-6 at 8.)

Falk testified about attendees—readers and writers—who came up to her complaining about Young, including about Young's work. (ECF No. 131-2 at 33–38, 57–58, 61–63.) Falk was *unwilling* to identify anyone aside from Wilson (*id.* at 33–38). When asked about how many people she believed made complaints about Young, Falk initially indicated she did not know because she was on pain pills, but ultimately approximated "10 or 12." (*Id.* at 64.) She testified that she did not like complaints because they hurt her business and did not like people saying they would not return to her convention. (*Id.* at 60–63.) Falk also testified that she did not see or speak with Young at the RT Convention and that she did not receive any complaints about Alexander. (*Id.* at 58; ECF No. 119-5 at 31.)

///

4

After the RT Convention, Wilson called Falk concerning her complaint about Young and to inquire about whether it had become public knowledge and indicated that she wanted to address the matter. (ECF No. 131-5 at 30.) Wilson testified that Falk stated "do what you got to do." (*Id.*) Falk's testimony indicates that Wilson showed her what she was writing regarding Young and that Falk warned "[y]ou're going to get in trouble for that." (ECF No. 119-5 at 17; *see also* ECF No. 119-11 at 6 (Wilson testifying that Falk warned her to be careful).) On May 2, 2016, Wilson posted to Facebook, beginning "Attention, Authors and Readers." (ECF No. 108-5.) In that post, Wilson stated, among other things, that a model had been acting extremely unprofessional, asserting sexual harassment by the model, that he had threatened to ruin her career and had asked her to sign a deal to get royalties from her books. (*E.g.*, *id.* at 3.) During her deposition, Wilson—apparently concerning her Facebook post—conceded she revealed Young's name and called him a predator. (ECF No. 131-5 at 32–33.)

Young additionally claims that Falk threatened him to "bow out or get your name sullied." (ECF No. 131-3 at 15.) During Falk's deposition, Plaintiffs' counsel introduced the relevant message from Falk to Young with the noted words, providing:

> [Young], I advise you to not have anything to do with [third-party] and his event . . . [B&N] says they will no longer cooperate with him again . . . his conference last year was a disaster . . . Bow out or you will get your name sullied.

(ECF No. 131-2 at 48; ECF No. 108-4 at 3.) Falk sent that message to Young in May 2015—not in relation to the RT Convention. (ECF No. 108-4 at 3.)

In April 2017, Falk responded to Facebook posts concerning Young within the Facebook group "Early Arrivals RT2017 Atlanta," stating: "JY[--as in Young--] is banned from any RT events." (ECF No. 131-13 at 3.) The first message in the thread was by an individual named Megan Bamford. (*Id.* at 2.) Bamford stated: "A certain cover-model had been removed from the group due to multiple allegations of abuse and blackmail. . . I'm not letting him back in." (*Id.*)

///

Plaintiffs brought this lawsuit on September 27, 2016. (ECF No. 1.) Plaintiffs allege the following thirteen claims: two claims under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), for trade libel/commercial disparagement and false advertising; common law business disparagement/trade libel; defamation; defamation per se; false light; intentional interference with contractual relations; intentional interference with prospective economic advantage; intentional infliction of emotional distress; negligent infliction of emotional distress; consumer fraud/deceptive trade practice; injunctive relief; and civil conspiracy/concert of action.

### III. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. Moreover, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

## IV. DISCUSSION

RT Defendants move for summary judgment primarily contending that Plaintiffs cannot or have not proffered sufficient evidence supporting their claims to withstand summary judgment. The Court addresses each of Plaintiffs' claims below and ultimately finds in favor of RT Defendants on all claims.

### A. Lanham Act Claims—First and Second Claims

Plaintiffs' first two claims are brought under the Lanham Act for trade libel/commercial disparagement and false advertising. (ECF No. 1 at 9–12.) Relevantly, RT Defendants argue that Plaintiffs fail to establish the elements of a prima facie case under the Lanham Act. (ECF No. 119 at 4–13; ECF No. 136 at 2–6.) RT Defendants particularly contend that Plaintiffs fail to establish that (1) RT Defendants made false statements about a product—of either Plaintiffs or RT Defendants, and/or (2) RT Defendants made statements in commercial advertisement or promotion (i.e., was in competition with Plaintiffs). (ECF No. 119 at 4–13; ECF No. 136 at 2–6.) While RT Defendants challenge the Lanham Act claims on the merits, upon *sua sponte* review the Court concludes that Plaintiffs lack standing to assert their Lanham Act claims on the same grounds Defendants identify. *See, e.g.*, *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999) ("[F]ederal courts are required sua sponte to examine jurisdictional issues such as standing.").

A plaintiff has the burden to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 61 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the constitutional minimum of standing]."). To establish standing under the Lanham Act, "a plaintiff *must show*: (1) a commercial injury based upon misrepresentation about a product; and (2) that the injury is 'competitive' or harmful to the plaintiff's ability to

7

compete with the defendant." *Jack Russell Terrier Network of Northern California v. American Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005) (emphasis added). "[W]hen [a] plaintiff competes directly with [the] defendant, a misrepresentation will give rise to a presumed commercial injury that is sufficient to establish standing." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011).

The Court finds that Plaintiffs fail to establish an injury that is cognizable under the Lanham Act. The common thread of Plaintiffs' first and second claims is that RT Defendants made statements amounting to false or misleading descriptions about Plaintiffs' products, goods, or services—including without limitation to their marketable personalities and personas—in advertisements, formal and informal promotions, and other commercial speech. (ECF No. 1 at 9–12.) But even accepting that the statements Plaintiffs attribute to RT Defendants were false or constitute misrepresentations, Plaintiffs cite no evidence that connects those statements to any particular product. (*See* ECF No. 131 at 15–17.)

Plaintiffs also made a futile attempt to establish direct competition between them and RT Defendants. (*Id.*) Plaintiffs first contend that the parties were in direct competition because Alexander was conducting a different romance writers' and readers' convention. (*Id.* at 16–17.) However, Plaintiffs also concede that Alexander's purported competing convention was in 2017 and 2018. (*Id.* at 17.) As noted, this lawsuit was brought in September 2016 concerning events that related to RT Defendants' convention that took place in spring 2016. (ECF No. 1.) There can be no triable issue of fact that RT Defendants made statements while in direct competition with Plaintiffs where the purported genesis of such competition occurred well after the alleged statements.

Plaintiffs further claim direct competition based on signing a confidentiality agreement with a third-party, Ashley Martinez, who Plaintiffs claim to be RT Defendants'

///

///

///

8

employee[6] and based on another third party—Desiree Holt—purportedly having a "competing [r]omance [c]onvention." (ECF Nos. 131 at 16–17.) As to Martinez, Plaintiffs provide Young's declaration saying he observed Martinez working for RT during the relevant convention. (ECF No. 131-10; *see also* ECF No. 119-3 at 11 (Young testifying that Martinez—but not Falk knew Plaintiffs' business model).) But at most Young speculates that Martinez shared Plaintiffs' alleged confidential business information with Falk. (*See id.*) There is no other evidence that may reasonably support an inference that Martinez shared business information with Falk, and such information alone would be insufficient to establish direct competition.

Additionally, as to Holt, Plaintiffs cite to Falk's purported testimony regarding the "competing" romance convention—Wild Wicked Weekend—and claimed that Falk admitted that Holt worked with Alexander. (ECF No. 131 at 17.) However, the deposition testimony Plaintiffs quote is not fully available in the record. *Compare id. with* ECF No. 131-2 at 58–59 (providing only page 222 then skipping to 224).) Notably, Alexander testified to co-organizing a single event—Wild Deadwood Reads—in June 2016 and does not mention Holt as a co-host. (ECF No. 119-4 at 7–8.) There is also no testimony or evidence that Falk knew of or anticipated this latter event at the time of the relevant events here. Holt's testimony, which Plaintiffs provide, discusses the Wild Wicked Weekend, notes she co-hosts the event with five other authors—Alexander is not named among them. (ECF No. 131-4 at 4–5.) The evidence does not support a reasonable inference that Falk or RT was in competition with Plaintiffs at the time of the alleged misrepresentations and/or false statements.

Accordingly, the Court finds that Plaintiffs lack standing to assert claims under the Lanham Act. Plaintiffs' first and second claims are therefore dismissed.

///

///

---

[6] Falk testified that she considered Martinez a friend and that Martinez was tantamount to an independent contractor who worked for RT/Falk's Sunday fair in 2016 and 2017. (ECF No. 132 at 41–43.)

9

### B. Consumer Fraud/Deceptive Trade Practices Claim—Eleventh Claim

Plaintiffs assert a claim for consumer fraud/deceptive trade practices under NRS §§ 41.600(2)(e) and 598.0915 through 598.0925. (ECF No. 1 at 19.)

NRS § 41.600(1) provides that "[a]n action may be brought by any person who is a victim of consumer fraud." A deceptive trade practices claim brought pursuant to NRS § 41.600(1) requires proof that the defendant committed consumer fraud causing damage to the plaintiff. *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 652 (D. Nev. 2009). To succeed on this claim, Plaintiffs must show that "(1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff." *Id.* at 658; *see* NRS § 41.600(2)(e) (defining consumer fraud as including deceptive trade practices listed in NRS §§ 598.0915 to 598 .0925).

In their eleventh claim, Plaintiffs specifically assert a violation of NRS § 598.0915(8). (ECF No. 1 at 19.) Plaintiffs contend that RT Defendants engaged in a pattern and practice of consumer fraud and deceptive trade practices by, among other things, '[d]isparag[ing] the goods, services or business of another person by false or misleading representation of fact[]' (*id.*). *See* NRS § 598.0915(8).

RT Defendants in gist argue that this claim fails for the same reasons Plaintiffs' Lanham Act claims fail. (ECF No. 119 at 13; ECF No. 136 at 6 (arguing that "Plaintiffs' Response does not address their absence of evidence of the statutorily required . . . disparagement of goods, services or business").) The Court agrees. Nothing in the record before the Court or cited by Plaintiffs in their argument (*see* ECF No. 131 at 15–17) supports a finding that RT Defendants disparaged Plaintiffs' business, or any goods or services Plaintiffs provided. The Court will therefore grant summary judgment in favor of RT Defendants on this claim.

### C. Injunctive Relief—Twelfth Claim

Plaintiffs seek injunctive relief, apparently premised on their Lanham Act and Nevada consumer fraud claims. (ECF No. 1 at 20–21; ECF No. 119 at 13 (Defendants so connecting Plaintiffs' request for injunctive relief; ECF No. 131 at 15–17 (Plaintiffs not

indicating otherwise and implicitly agreeing that their request for injunction are tailored to these claims).) Given the Court's conclusions regarding the relevant claims—one, two and eleven—the Court grants summary judgment on Plaintiffs' injunctive relief claim.

**D. Common Law Business Disparagement/Trade Libel Claim; Defamation; and Defamation Per Se (Slander/Libel Per Se)—Third, Fourth, and Fifth**

To show defamation a plaintiff must prove four elements: "(1) a false *and* defamatory statement . . .; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Clark Cty. Sch. Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d 496, 503–04 (Nev. 2009) ("*Clark*") (quotations and citations omitted) (emphasis added). "A statement is defamatory when it would tend to lower the subject in the estimation of the community, excite derogatory opinions about the subject, and hold the subject up to contempt." *K–Mart Corporation v. Washington,* 109 Nev. 1180, 1191, 866 P.2d 274, 281–82 (1993) (citing *Las Vegas Sun v. Franklin,* 329 P.2d 867, 869 (1958)). "Whether a statement is defamatory is generally a question of law; however, where a statement is susceptible of different constructions, one of which is defamatory, resolution of the ambiguity is a question of fact for the jury." *Lubin v. Kunin*, 17 P.3d 422, 425–26 (Nev. 2001) (internal quotations and citations omitted). "In reviewing an allegedly defamatory statement, '[t]he words must be reviewed in their entirety and in context to determine whether they are susceptible of a defamatory meaning.'" *Id.* at 425.

Additionally, if the statement "imputes a person's lack of fitness for trade, business, or profession, or tends to injure the plaintiff in his or her business, it is deemed defamation per se," which means the court may presume damages. *Clark*, 213 P.3d at 503. If the statement is directed toward "the quality of the individual's products or services" it may support a claim for business disparagement rather than defamation per se. *Id.* at 504*; see also id.* (providing that differently from defamation, "business disparagement requires something more, namely, malice").

Plaintiffs' defamation, defamation per se, and business disparagement claims essentially rest on the same arguments. Plaintiffs contend that RT Defendants—particularly Falk, defamed them by publishing defamatory statements to Williams and Wills; banning Young from RT events, in part based on Wilson's Facebook post and ratified Bamford's "defamatory statements" in her Facebook post by announcing that Young was banned from RT events without conducting an investigation into the veracity of the allegations against Young. (ECF No. 108 at 7 (as incorporated by ECF No. 131 at 22).) Plaintiffs also argue that Falk "insinuated" to Marla Williams that Alexander and Young were having an affair. (ECF No. 131 at 22.) Plaintiffs further claim that Falk "commanded" Wilson's actions toward Plaintiffs (*id.* at 23 (citing ECF No. 131-5 at 11–12, 29–31)) and include that Falk told Young to "[b]ow out or get your name sullied" (*id.*).

RT Defendants argue that considering Falk's answers to Williams and Wills in context of having received complaints concerning Young, Falk's answers do not amount to defamation. (ECF No. 119 at 19–23; ECF No. 136 at 8.) The Court agrees Plaintiffs' defamation and defamation per se claim fails.

Viewed in the light most favorable to Plaintiffs, a reasonably juror could conclude that Falk's statements informing of the complaints she received about Young likely lowered the view of Young so as to be defamatory. However, Falk's statements necessarily must also be false. Here, Falk and Wilson's testimony supports that Falk received complaints about Young—as Falk informed Williams and Wills—and Plaintiffs have produced nothing to the contrary. *See Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995) ("[W]e examine . . . the specific context in which the statements were made, and the statements themselves to determine whether a reasonable factfinder could conclude that the statements imply a false assertion of objective fact and therefore fall outside of the protection of the First Amendment."). That Plaintiffs believe Falk insinuated that they were having an affair does not amount to a statement giving rise to defamation. That Falk banned Young from RT events or stated that he was banned from RT events is not actionable. The ban is not a statement, and the statement is not otherwise established as

having been false. Additionally, Plaintiffs cannot rest their claims of defamation underlying this case based on statements provided in the context of Bamford's 2017 Facebook thread—several months after Plaintiffs brought this action alleging defamation. There is also no evidence that Falk banned Young from RT events *based on* Wilson's Facebook post. Further, the noted evidence does not substantiate that Falk "commanded" Wilson's purportedly *defamatory actions.* Finally, Falk's 2015 advice to Young regarding his name being sullied cannot reasonably be considered defamatory—if at all relevant to this action (*see* ECF No. 131-2 at 48; ECF No. 108-4 at 3). In short, the Court finds that Plaintiffs cannot establish the first element of a defamation claim and the defamation per se claim likewise fails.

Plaintiffs' business disparagement/trade libel claim similarly fails against RT Defendants because there is no evidence that RT Defendants made statements about the quality of any products or services relevant to the Court's inquiry.

Moreover, the Court concludes that based on the evidence, a reasonable juror would not infer malice by RT Defendants. Plaintiffs appear to rest their contention of maliciousness and/or recklessness based on the fact that Falk did not investigate the complaints she testified to receiving. (*E.g.*, ECF No. 131 at 23–24.) Malice is proven when the plaintiff can show either that the defendant published the disparaging statement *with the intent* to cause harm to the plaintiff's pecuniary interests, or the defendant published a disparaging remark *knowing* its falsity or with reckless disregard for its truth. *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 92-93 (Nev. 2002). Reckless disregard for the truth is evaluated subjectively and "may be found when the defendant entertained serious doubts as to the truth of the statement, but published it anyway.'" *Id.* at 92 (quoting *Posadas v. City of Reno*, 851 P.2d 438, 443 (1993)). As noted, Plaintiffs have produced no evidence to support a reasonable inference that Falk did not in fact receive the complaints about Young. Further, Falk testified that she "took [the complaints] to heart" (ECF No. 131-2 at 63), suggesting she was not subjectively reckless or acted maliciously regarding Young. Moreover, Plaintiffs provide no authority establishing that Falk had a

13

duty to investigate the complaints before either relaying that she had received such complaints in conversations where Young's name was mentioned to her or before banning Young from RT events.

In sum, the Court will grant summary judgment on Plaintiffs' defamation, defamation per se and common law business disparagement/trade libel claims.

### E. False Light—Sixth Claim

Plaintiffs assert a false light claim which appears to be related but distinct from their defamation claims. (ECF No. 1 at 15–16.)

A false light claim may be maintained only where there is some false statement of objective fact and actual malice. *Flowers v. Carville*, 266 F. Supp. 2d 1245, 1252 (D. Nev. 2003). A false light claim differs from a defamation claim because the alleged injury is from mental distress resulting from exposure to public views whereas a defamation claim concerns reputational harm. *Id.*

The Court finds this claim fails for the same reasons Plaintiffs' defamation related claims fail and because the Court concludes that Plaintiffs cannot establish that RT Defendants acted with malice.

### F. Intentional Interference with Contractual Relations—Seventh Claim

RT Defendants argue that Plaintiffs cannot establish that they interfered with any actual contracts or that RT Defendants had knowledge of the same. (ECF No. 119 at 24.) The Court agrees.

In an action for intentional interference with contractual relations, a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003). This claim requires proof of intentional acts by a defendant intended or designed to disrupt a plaintiff's contractual relations. *Id.* at 1268.

As a baseline, Plaintiffs provide no evidence of contracts with third parties that RT Defendants interfered with—as alleged in the Complaint (ECF No. 1 at 16). (ECF No. 131

at 24–26.) Instead, Plaintiffs attempt to argue that they had a contract with RT merely based on their attendance at the RT Convention. (*Id.* at 25.) Even assuming that Plaintiff is now reasserting this claim only against Falk—as legally distinct from RT, the Court has no basis to conclude a valid contract—or any material business relationship—existed between RT and Plaintiffs. Certainly, RT Defendants cannot be found to have established relevant contracts with attendees—all purported 3,500 (*see, e.g.*, ECF No. 131 at 25)—based on mere attendance at an RT Convention. At most, Plaintiffs cite to muddled testimony by Defendant Wilson that appears to conflate registration for the RT Convention with actual contracts. (ECF No. 131 at 25 (citing ECF No. 135-5 at 18–19).) The Court will therefore grant summary judgment for RT Defendants on this claim.

**G. Intentional Interference with Prospective Economic Advantage— Eighth Claim**

RT Defendants have also established that there is no evidence to support a finding that RT Defendants plausibly interfered with any prospective economic advantage Plaintiffs had. (ECF No. 119 at 23–25; ECF No. 136 at 13–14.)

In order to establish a claim for interference with prospective economic advantage in Nevada, a plaintiff must establish the following elements: (1) a prospective contractual relationship between the plaintiff and a third party; (2) the defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff by preventing this relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result. *Custom Teleconnect, Inc. v. Int'l Tele–Servs., Inc.*, 254 F. Supp. 2d 1173, 1180–81 (D. Nev. 2003).

Plaintiffs identify only two actual examples of prospective business relationships— particularly between Young and third parties Anne Wills and Dan O'Brien. (ECF No. 131 at 25–26.)[7] There is absolutely no evidence in the record that RT Defendants even knew

///

---

[7] Plaintiffs appear to also contend that the mere setting of the RT Convention created prospective contractual relationships. (ECF No. 131 at 25.) Such a contention is

15

of O'Brien's relationship with Young. (*Id.*) In any event, to the extent Plaintiffs rely on O'Brien for estimates that Young lost profits based on allegations against Young, Plaintiffs at most speculates that such allegations stem from or are connected to RT Defendants. (*Id.* at 26.) Plaintiffs cannot avoid summary judgment with speculation.

As to Wills, Plaintiffs contend that RT Defendants had knowledge of a potential business opportunity between Wills/her company and Plaintiffs based on the following exchange Wills testified to having with Falk during the RT Convention. Wills claim she mentioned to Falk:

> Well, you know, I attended a musical event with a young man that I think is really talented named Jackson Young. And he – maybe next year we could do something like a much bigger concert with him. Maybe Blushing Books could sponsor that or something like that.

(ECF No. 131-11 at 4.) Wills testified that Falk responded saying:

> Well, I don't know that he is going to be coming back because we've had problems with him at two different conferences.

(*Id.*) The reasonable inference that may be drawn from this exchange between Wills and Falk is that Wills wanted RT Defendants to consider a potential performance by Young at the following year's RT Convention to be sponsored by Wills' company. At most, there is a tenuous prospective business relationship and it is unclear whether there would in fact be a contractual agreement with a third party—as this claim requires. Presumably, RT Defendants would be the party contracting with Young to perform at RT Defendants' convention. Even assuming Young would also have been required to contract separately with Wills for his performance to be sponsored,[8] there is no evidence—only conjecture— that Falk intended to harm Young *by* preventing such a relationship. While Plaintiffs cite to their deposition testimony as supporting their belief that Falk intended to cause them

///

---

amorphous. It provides no concrete likelihood of a contractual relationship with any particular third-party to support this claim.

[8]A separate sponsorship agreement would likely require an agreement between Young and RT Defendants as a prerequisite.

16

harm (ECF No. 131 at 26; *cf.* ECF No. 131-3 at 24–25; ECF No. 131-8 at 23), the Court agrees with RT Defendants that such belief is wholly unsubstantiated (ECF No. 136 at 13). The Court will likewise grant summary judgment for RT Defendants on this claim.

### H. Intentional Infliction of Emotional Distress (IIED) and Negligent Infliction of Emotional Distress (NIED)—Ninth and Tenth Claims

"The elements of a cause of action for intentional infliction of emotional distress are (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 886 (Nev. 1999) (internal quotation and citation omitted). Conduct is extreme or outrageous if it is atrocious, beyond all possible bounds of decency, and utterly intolerable. *Churchill v. Barach*, 863 F. Supp. 1266, 1275 (D. Nev. 1994). The Nevada Supreme Court applies a "sliding-scale approach" to the emotional distress element of an IIED claim—more serious conduct "will require less in the way of proof that emotional distress was suffered." *Cal. Franchise Tax Bd. v. Hyatt*, 335 P.3d 125, 147–48 (Nev. 2014). Under this approach, severe emotional distress may be established through medical evidence or, where the conduct is extreme, "other objectively verifiable evidence." *Id.* at 148. "The court determines whether the defendant's conduct may be regarded as extreme and outrageous so as to permit recovery, but, where reasonable people may differ, the jury [must determine] whether the conduct was extreme and outrageous enough to result in liability." *Chehade Refai v. Lazaro,* 614 F. Supp. 2d 1103, 1121 (D. Nev. 2009).

To recover for negligent infliction of emotional distress under Nevada law, Plaintiff must likewise establish that he/she either suffered a physical impact or "serious emotional distress" causing physical injury or illness. *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998) ("We . . . hold that, in cases where emotional distress damages are not secondary to physical injuries, but rather, precipitate physical symptoms,
///

either a physical impact must have occurred or, in the absence of physical impact, proof of "serious emotional distress" causing physical injury or illness must be presented.").

RT Defendants argue they are entitled to summary judgment on both the IIED and NEID claims because these claims are not factually or legally supported to the necessary degree. (ECF No. 119 at 26–28; ECF No. 136 at 14–15.) The Court agrees.

Plaintiffs have not provided the kind of evidence to support a finding in their favor on either claim. Relevant to both claims is that Plaintiffs only contend they suffered *emotional* distress based on the fact that they sought mental health treatment. (ECF No. 131 at 27; *see also* ECF No. 131-8 at 21 (Alexander testifying that she sought several sessions of couples' counseling with her spouse); ECF No. 131-3 at 9–10 (testifying that he admitted himself to the hospital because he "thought [he] was going to commit suicide").) But, even in the context of an NEID claim, *Barmettler* requires that the emotional distress result in physical injury. *Id.* (concluding also that "the district court correctly found that the additional minimal therapy undergone by Barmettler did not satisfy the physical injury "or impact" requirement of *Chowdhry* [*v. NLVH, Inc.*, 851 P.2d 459 (1993)]")*.* Plaintiffs' failure to establish this lower threshold additionally weighs against any finding that Plaintiffs are able to provide the type of medical evidence or objectively verifiable evidence required to support a claim for IIED—particularly the second prong.

The Court will accordingly grant summary judgment for RT Defendants on Plaintiffs' IIED and NIED claims.

**I.     Civil Conspiracy/Concert of Action—Thirteenth Claim**

To establish a claim for civil conspiracy under Nevada law, a plaintiff "must show a combination of two or more persons who, by some concerted action[--explicit or tacit agreement--], intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Tai-Si Kim v. Kearney*, 838 F. Supp. 2d 1077, 1093 (D. Nev. 2012) (internal quotations and citations omitted). To maintain a concert of action claim "the plaintiff must show the defendants 'agreed to engage in conduct that is

*///*

inherently dangerous or poses a substantial risk of harm to others.'" *Id.* at 1092 (quoting *GES, Inc. v. Corbitt,* 21 P.3d 11, 14–15 (2001)).

In support of their conspiracy claim, Plaintiffs largely reference conduct after the initiation of this lawsuit (ECF No. 131 at 28–29) which the Court cannot consider. Plaintiffs otherwise premise their contention of a conspiracy on their assertion that Falk and Defendant Wilson acted to harm and defame Plaintiffs based on Wilson's Facebook post and that Falk and Wilson had spoken—including Falk's statement to Wilson to "do what you got to do." (*Id.* at 28 (citing ECF No. 131-5 at 29–30 (Wilson's testimony)).) But the relevant testimony more completely details that Wilson had seen Falk at two RT Conventions and spoke with Falk "a couple times, yes, but not always about Jackson." (ECF No. 131-5 at 29.)

Wilson testified that she spoke to Falk at the RT Convention and then spoke to her after the convention via phone to inquire if Wilson's "complaint to [Falk] had become public knowledge" because "everything blew up and my name started getting tagged in stuff" (ECF No. 119-11 at 4–6; ECF No. 131-5 at 30). She explained that she spoke to Falk a second time over the phone after this lawsuit was filed. (ECF No. 119-11 at 6.) Wilson's testimony also indicates that Falk's statement to "do what you what to do" was in the context of Wilson telling Falk "I don't know what's going on, but I'm going to have to do something because I'm literally being dragged through the mud." (ECF No. 131-5 at 30.) Further, the testimony of both Falk and Wilson supports that Falk attempted to warn Wilson regarding what Wilson wanted to do. (ECF No. 119-5 at 17; *see also* ECF No. 119-11 at 6.) Plaintiffs are essentially contending that Wilson's subsequent Facebook post—which Wilson provides was not posted the same day she spoke with Falk (ECF No. 131-5 at 30)—reflects a conspiracy between Falk and Wilson to defame Plaintiffs—specifically Young. (ECF No. 131 at 28.) The Court concludes that, given the relevant facts in the record, a reasonable juror would not infer tacit or explicit agreement between Wilson and Falk to support either Plaintiffs' claim of conspiracy or concerted action to permit this claim

///

to move beyond summary judgment. The Court will therefore grant summary judgment for RT Defendants on this claim.

Because the Court concludes that RT Defendants are entitled to summary judgment on all claims Plaintiffs assert—separate from claims otherwise dismissed, RT Defendants' MPSJ (ECF No. 103) is denied as moot.

Although Wilson did not join in RT Defendants' motion for summary judgment, the Court similarly grants summary judgment for Wilson on Plaintiffs' claims against her for intentional and negligent infliction of emotional distress, and civil conspiracy/concert of action—claims nine, ten, and thirteen. *See, e.g.*, *Greene v. Solano Cty. Jail*, 513 F.3d 982, 990 (9th Cir. 2008) (supporting that a sua sponte grant of summary judgment is permissible where the non-moving party "has 'reasonable notice that the sufficiency of his or her claim will be in issue'").

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that RT Defendants' motion for summary judgment (ECF No. 119) is granted on all claims Plaintiffs assert. The Lanham Act claims are dismissed—as against RT Defendants—for lack of standing.

It is further ordered that Plaintiffs' unopposed motion for leave concerning its response to ECF No. 103 (ECF No. 135) is granted.

It is further ordered that RT Defendants' motion for partial summary judgment regarding punitive damages (ECF No. 103) is denied as moot.

DATED THIS 7th day of August 2019.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE